Ralph GAUSVIK, Plaintiff,

v.

Robert Ricardo PEREZ, individually, and in his official capacity; et al., Defendants.

No. CS–01–071–AAM.

United States District Court, E.D. Washington.

Nov. 27, 2002.

John S. Stocks, Van Siclen Stocks & Firkins, Auburn, WA, Robert Craig Van Siclen, Tyler K. Firkins, Van Siclen Stocks & Firkins, Auburn, WA, for Ralph Gausvik.

Patrick G. McMahon, Carlson McMahon & Sealby PLLC, Wenatchee, WA, for Robert Ricardo Perez.

Patrick G. McMahon, Carlson McMahon & Sealby PLLC, Wenatchee, WA, for Kenneth J. Badgley, Earl Tilley, City of Wenatchee, Wenatchee Municipal Police Dept.

Stanley Allen Bastian, Jeffers Danielson Sonn & Aylward PS, Wenatchee, WA, for Chelan County.

Joel E. Wright, Lee Smart Cook Martin & Patterson PS, Seattle, WA, for Barker & Howard PS Inc., Jeffrey Barker, Keith Howard.

## ORDER DENYING MOTION FOR RECONSIDERATION

MCDONALD, Senior District Judge.

**BEFORE THE COURT** is the plaintiff's Motion for Reconsideration (Ct.Rec. 248).

## I. BACKGROUND

Defendant Robert Perez of the City of Wenatchee Police Department was the lead investigator in what became known as the "Wenatchee Sex Ring" cases. His investigation led to the arrest of plaintiff Ralph Gausvik.

On November 2, 1995, a Chelan County jury found plaintiff guilty of six counts of rape of a child and child molestation.[1] In January 1998, the Washington Court of Appeals reversed plaintiff's convictions on two of the counts, but affirmed on the remaining counts. On November 18, 1998, defendant was resentenced to a term of imprisonment of 260 months.

In June 2000, pursuant to a personal restraint petition filed by plaintiff, the Washington Court of Appeals remanded the matter to the Chelan County Superior Court for a reference hearing to determine the reliability of the victims' accusations. The matter was specifically remanded to Hon. Wallace Friel, a Whitman County Superior Court Judge. The State thereafter voluntarily dismissed all of the charges against Mr. Gausvik because Judge Friel had made findings in previous reference hearings in other cases that Perez had improperly interviewed alleged abuse victims. The State therefore, believed it could not prevail in Mr. Gausvik's case.

After the charges against him were dismissed, Gausvik commenced this suit alleging violations of his federal constitutional rights under 42 U.S.C. § 1983 and further alleging various state law causes of action. Named as defendants were: Robert Perez, Kenneth J. Badgley, Chief of the Wenatchee Police Department during the relevant time, Earl Tilly, Mayor of the City of Wenatchee and Director of the Public Safety Committee at the relevant time, City of Wenatchee, Wenatchee Municipal Police Department, Chelan County, Barker & Howard, P.S., Inc., and Jeffrey Barker and Keith Howard, the principals of Barker & Howard.

In an order filed July 11, 2002 (Ct.Rec. 134), this court granted summary judgment in favor of defendants Chelan County, Barker & Howard, P.S., Inc., and Jeffrey Barker and Keith Howard on the § 1983 claims against them and declined to exercise supplemental jurisdiction over the state law claims against them. In an order filed September 16, 2002 (Ct.Rec.241), this court granted summary judgment in favor of defendants Badgley, Tilly and City of Wenatchee on plaintiff's § 1983 claims. This court declined to grant summary judgment in favor of defendant Perez on the § 1983 claims and in turn, declined to grant him qualified immunity. Perez promptly appealed that determination to the Ninth Circuit and the appeal remains pending at this time. In its September 16,

---

1. These counts related to Gausvik's children, Troy and Delilah Garaas, and another child who lived with Gausvik, Travis Garaas.

2002 order, this court also granted summary judgment in favor of Perez, Badgley, Tilly and City of Wenatchee on plaintiff's state law claims, finding those claims barred by the applicable statutes of limitations.

Plaintiff now asks this court to reconsider two aspects of its September 16, 2002 order: 1) this court's granting of summary judgment to defendant City of Wenatchee on plaintiff's § 1983 claims; and 2) this court's granting of summary judgment to Perez, Badgley, Tilly and City of Wenatchee on the state law claims finding those claims barred by the applicable statutes of limitations.

## II.  DISCUSSION

### A.  Reconsideration Standard

■ Motions for reconsideration serve a limited function.  " '[T]he major grounds that justify reconsideration involve an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.' "  *Pyramid Lake Paiute Tribe v. Hodel*, 882 F.2d 364, 369 n. 5 (9th Cir.1989) (quoting 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4478, at 790); *see Frederick S. Wyle P.C. v. Texaco, Inc.*, 764 F.2d 604, 609 (9th Cir.1985); *see also Keene Corp. v. International Fidelity Ins. Co.*, 561 F.Supp. 656, 665 (N.D.Ill.1982) (reconsideration available "to correct manifest errors of law or fact or to present newly discovered evidence").  Such motions are not the proper vehicle for offering evidence or theories of law that were available to the party at the time of the initial ruling.  *Fay Corp. v. Bat Holdings I, Inc.*, 651 F.Supp. 307, 309 (W.D.Wash.1987); *see Keene Corp.*, 561 F.Supp. at 665–66.

Nowhere in his motion for reconsideration and memorandum of authorities does the plaintiff cite and discuss the standard for motions for reconsideration.  Nor has plaintiff filed a reply to defendants' response to plaintiff's motion for reconsideration.  ·

### B.  City of Wenatchee Municipal Liability Under § 1983

Although plaintiff does not cite or discuss the reconsideration standard, it appears he contends this court clearly erred in finding as a matter of law that the City of Wenatchee is not liable under § 1983 and/or that this decision causes a manifest injustice to him.

According to plaintiff, the evidence he presented is more than sufficient to raise a genuine issue of material fact that Wenatchee had a policy and/or custom of using coercive interview methods with children and fabricating evidence of sexual abuse.  A specific "custom" argument was not to be found in the memorandum of authorities plaintiff filed on July 22, 2002 (Ct.Rec. 160).  Consequently, this court's September 16, 2002 order 239 F.Supp.2d at pp. 1102 – 1104 did not specifically discuss "custom."

In its September 16, 2002 order, this court made a couple of observations which are pertinent to plaintiff's motion for reconsideration.  Pages 1099 – 1102 of this court's order discussed supervisory liability of defendants Badgley and Tilly.  The discussion therein relates to the issue of municipal liability to the extent plaintiff alleges that actions Badgley and Tilly took in their official capacities, as opposed to their individual capacities, constituted part of a municipal policy and/or custom which inflicted constitutional harm upon the plaintiff.  At pages 1101 – 1102 of its order, this court observed that plaintiff had filed a motion to supplement his summary judgment response (Ct.Rec.221) with proof apparently intended to establish supervisory liability on the part of Badgley and

Tilly.[2] This court found it failed to do so because it did not establish any causal connection between Badgley's alleged action or inaction and the infliction of the alleged unconstitutional harm to plaintiff. In a footnote, n. 31 at p. 1101, this court observed that plaintiff merely submitted the proof without an accompanying memorandum explaining how it was supposed to establish supervisory liability, or municipal liability for that matter. For that reason alone, this court stated it would be justified in disregarding the supplemental proof. Because the court believed the proof did not establish supervisory liability, however, it granted plaintiff's motion to supplement his summary judgment response.

Along with his memorandum of authorities in opposition to defendants' motion for summary judgment, plaintiff filed a lengthy statement of material facts on July 22, 2002 (Ct.Rec.161). Pages 20–52 list numerous facts (Nos. 70–182) under the heading of *"Monell Facts Demonstrating a Pattern and Practice."* At pp. 1103–1104 of its September 16, 2002 summary judgment order, this court noted that "[p]laintiff's lengthy statement of material facts raises municipal liability arguments which are not discussed in his memorandum of

authorities" and "[f]or that reason alone, those arguments can be disregarded."

Because of plaintiff's "shotgun" approach regarding supervisory and municipal liability, this court focused on the specific arguments advanced in plaintiff's memorandum in opposition to summary judgment and properly considered plaintiff's statement of material facts and supplemental proof only insofar as they supported the specific arguments contained in plaintiff's memorandum. The focus of plaintiff's memorandum in opposition to Wenatchee's motion for summary judgment was municipal liability based on failure to train and supervise. This court addressed the particular factual arguments raised by plaintiff in his memorandum i.e., investigation by Captain Murray; 1997 "fitness for duty" evaluation of Perez from clinical psychologist; Badgley's review of Perez's police reports.

What the plaintiff has now done with his motion for reconsideration is present a memorandum of authorities regarding municipal liability which he should have presented as part of his original response. This latest memorandum represents a somewhat more coherent, refined and expansive argument regarding municipal liability, discussing more of the proof ten-

---

**2.** This supplemental proof was filed under the "Supplemental Declaration of Tyler K. Firkins in Opposition to Motion for Summary Judgment" (Ct.Rec.225) on August 12, 2002. It consists of the declaration and the following exhibits: Ex. A (the Perez "investigative" file); Ex. B (excerpts of July 24, 2002 deposition testimony of Wenatchee Police Captain Richard C. Murray from July 24, 2002); Ex. C (excerpts of July 24, 2002 deposition testimony from former Wenatchee Police Chief Badgley); and Ex. D (employee evaluations of Perez). The declaration and exhibits were filed under seal.

The employee evaluations contained at Ex. D are of some interest. Perez's 1989 annual performance evaluation criticized Perez for, among other things, being "like a wound up

wire, ready to spring." His 1990 evaluation, however, states Perez had shown "significant improvement in the past year in several performance categories" including becoming "more people oriented and his patience with those he contacts has improved." The 1989 evaluation, particularly in light of the 1990 evaluation, would not have served as clear notice to Badgley that Perez presented a problem and should have never been assigned to investigate child abuse cases several years later. See also n. 30 at p. 1101 of this court's September 16, 2002 summary judgment order. Dr. Goodwin spoke of a 1991 evaluation which criticized Perez as a "live wire ready to go off," but it appears the evaluation to which he was actually referring was the one from 1989.

dered as part of the plaintiff's original statement of facts (Ct.Rec.161) and "supplemental proof" (Ct.Rec.225).[3] As noted above, plaintiff also for the first time specifically advances a "custom" argument which was missing from his original memorandum of authorities (Ct.Rec.160) filed in opposition to Wenatchee's summary judgment motion.

■ While plaintiff's motion for reconsideration suffers from obvious procedural deficiencies, the court reluctantly delves into the substantive arguments advanced therein.

### 1. Failure to Train and Supervise

Once again, plaintiff contends Badgley and Tilly were policymakers who had either actual or constructive knowledge of unconstitutional conduct on the part of Perez (coercive interviewing techniques), failed to take corrective action and therefore, by virtue of their deliberate indifference, the City of Wenatchee can be held liable under § 1983. Yet again, plaintiff fails to explain how former Mayor Tilly could be considered a policymaker with regard to interview techniques, nor offer any evidence in support of such an explanation. Indeed, plaintiff does not even explain or offer evidence of how Tilly might be considered to have been Perez's supervisor. On the other hand, as this court stated in its previous order, "a plausible argument can be made that Badgley, merely by virtue of being the chief of police, was a policymaker with regard to police procedure, tactics and training." (Order at p. 1103). Moreover, there is no question that Badgley, as chief of police, was Perez's supervisor.

Plaintiff asserts that Badgley and Tilly "received numerous complaints both verbally and in writing regarding the coercive interviewing tactics of Perez." Plaintiff says Badgley, at the direction of Tilly, investigated some, but not all of these complaints and "did nothing more than review a summary report prepared by biased officers who failed to even interview the children who had been coerced." According to plaintiff, despite the fact that each of these investigations resulted in determinations that there was insufficient evidence to either sustain or dismiss the complaint," Badgley and Tilly took no further action. Plaintiff adds that an investigation of a "comprehensive citizen complaint" was commenced in April 1995, but the city failed to complete the investigation and Perez continued with his investigations, including investigation of the plaintiff.

Plaintiff says that in addition to "citizen complaints," Badgley and Tilly knew or should have known of Perez's coercive interview techniques because of extensive media coverage and criticism of Perez's investigations. Along with his motion for reconsideration, the plaintiff has submitted a declaration from his counsel (Ct.Rec.251) to which are attached copies "of various newspaper articles regarding 'The Wenatchee Sex Ring' that were published in both local and national newspapers in 1995." [4]

There are obvious hearsay issues with regard to the content of these newspaper articles. In any event, there is no dispute that there was extensive media coverage and criticism. In his deposition, Badgley acknowledged being aware of some of it. (Ex. C to Supplemental Declaration of Ty-

---

**3.** Plaintiff's Motion for Reconsideration states the facts pertinent to the motion are those set forth in the previous LR 56 statements of facts filed in opposition to the city's motion for summary judgment.

**4.** These articles were not previously submitted by plaintiff as part of his original response to defendants' summary judgment motion.

ler K. Firkins (Ct.Rec.225) at pp. 16–17; 47). In its September 16, 2002 order, this court stated that it saw "no reason why Badgley was supposed to accept the media reports at face value." (Order at p. 63).

Plaintiff says his numerous declarations from children who were allegedly subject to coercion by Perez, "coupled with the unrebutted declaration of Dr. Phillip Esplin," raise a genuine issue of material fact that Perez's conduct was so widespread that it constituted a policy of the Wenatchee police department.

In its September 16, 2002 summary judgment order, this court observed that plaintiff had offered evidence of other children who claimed Perez coerced or attempted to coerce them into making false allegations of abuse (Jessika Still, Melinda Everett, Clarissa Chavez, Richard Everett, Shawn Everett, Kimberly Allbee, Sarah Doggett, Melissa Henkel and Amber Doggett). Although defendants objected to this evidence as improper character evidence, this court found that, at least for summary judgment purposes, it was admissible to prove either motive, intent, plan or knowledge by Perez. (Order at p. 1092). That does not necessarily mean it also raises a genuine issue of material fact that Badgley knew or should have known in 1995 that there might be a problem with

Perez. With regard to all of these children, with the exception of the Henkels (discussed below), it was a considerable time after Mr. Gausvik was convicted (November 1995) that they alleged Perez coerced or attempted to coerce them into making false allegations of abuse.[5]

Plaintiff cites *Henry v. County of Shasta,* 132 F.3d 512, 519 (9th Cir.1997), *amended,* 137 F.3d 1372 (9th Cir.1998), in which the Ninth Circuit held that post-event evidence is admissible for proving the existence of a municipal defendant's policy or custom and "may be" highly probative of that inquiry. The post-event evidence in *Henry* consisted of two declarations of individuals who said they had been abused at the Shasta County jail in a fashion similar to that of the plaintiff (Henry). One individual said he had been subject to abuse two to three months after Henry filed his § 1983 action. The circuit found it was "a reasonable inference indeed, the only reasonable inference that after Henry filed suit and successfully served process against the county, it knew about the alleged malfeasance of its employees at the jail." *Id.* at 518. Another individual was subject to abuse only two and a half months after the plaintiff. According to the circuit, "such close proximity in time of the two events lends further

---

**5.** Jessika Still's declaration dates from May 2002 and reports an interview with Perez from 1994 (Plaintiff's Ex. 93). Clarissa Chavez's declaration dates from September 1999 and reports an interview with Perez from September 1994 (Ex. 96). Richard Everett testified in a Spokane County Superior Court civil trial in July 2001 (*Rodriguez v. Perez et al;* and *Roberson v. Perez, et al.*). He also testified at the personal restraint petition reference hearings involving his parents, Harold and Idella Everett, in May 1998. (Exs. 109 and 110). Plaintiff offers deposition testimony from Shawn Everett taken in January 1998. (Ex. 111). The declaration of Kimberly Allbee is dated October 2001. She discusses an interview with Perez in February 1995.

(Ex. 112). Plaintiff also offers hearing testimony from Sarah Doggett from 1998 (Ex. 113). All of the foregoing declarations, hearing testimony and deposition testimony, are from litigation other than the case before this court.

In the case before this court, plaintiff filed a declaration from Amber Doggett which discusses an interview that took place in December 1994, several months before the Gausvik investigation (Ex. 151). Amber's declaration, in which she relates alleged coercion by Perez, is dated July 2002 and it is unclear when she first asserted coercion and recanted allegations of abuse against her parents. There is no evidence that this occurred prior to the Gausvik investigation.

support[ ] to Henry's claim that his treatment was not an isolated event but was instead inflicted in accordance with county policy." *Id.* at 519. This court has not been made aware that in 1995 when plaintiff Gausvik was investigated for abuse and eventually arrested and convicted, there were any pending civil lawsuits against the City of Wenatchee for alleged coercive interviewing techniques by Perez.

Dr. Esplin, plaintiff's expert witness, opines that the interview techniques employed by Perez in the Gausvik case "were so coercive and abusive that Perez, and his supervisors who reviewed his reports, knew or should have known, that the interviews would yield false information." (Declaration of Esplin, Ct. Rec. 168, at p. 4). Other than this conclusory statement about supervisory liability, however, Esplin does not state how Badgley, simply on the basis of reviewing paper reports from Perez, would have known that Perez was coercing allegations of abuse from the Garaas children. Esplin's opinion is not derived simply from looking at Perez's reports. It is derived from a variety of different documents, in addition to the police reports, such as caseworker notes of the interviews, deposition testimony, trial testimony, declarations, affidavits, etc. (See Ex. B to Declaration of Esplin).

For the first time in his motion for reconsideration, plaintiff specifically mentions an Amy Filbeck who, although she alleged coercion by Perez during an interview, apparently intended to complain about another officer, Sergeant Pippen. The interview in question apparently occurred sometime in October 1994 and Filbeck's complaint arose in February 1995. (See Ex. A to Ct. Rec. 225, pp. 000056–000061). Plaintiff says this evidence shows that other officers were using coercive interview techniques such as would evidence a policy on the part of the City of Wenatchee condoning such techniques. The evidence, however, also shows that Amy was an "adult" at the time of her interview by Pippen and that her complaint was investigated by the Wenatchee Police Department, specifically by Sergeant Mike Magnotti. Pippen denied ever calling Filbeck a liar or raising his voice during the interview.

In late August of 1995, declarations of Brian and Melissa Henkel were filed in the Chelan County criminal action, *State v. Devereaux* (Plaintiff's Exs. 114 and 115). In his declaration, Brian, 11 years old at the time, stated that on August 22, 1995, Perez and Sgt. Magnotti came to his house where he was with his 13 year old sister and a 12 year old friend, Steven. According to Brian, Magnotti identified Perez as the "guy who was in the sex ring thing" and that Magnotti needed to talk to Brian about that. Brian says Magnotti pulled him aside and told him he would not get in trouble if he told anybody that he had been touched. Brian says he denied anything had happened and that Magnotti responded by saying "[l]et's make a deal, tell me what happened and you won't get in any trouble." Plaintiff alleges that Brian Henkel's declaration shows Magnotti "used the threat of Perez to attempt to bully an allegation or 'disclosure' from the Henkel children." The fact is, however, that Brian Henkel did not make any disclosure about abuse.

In her declaration, Melissa Henkel corroborated much of what Brian said in his declaration. According to Melissa, she had a conversation with Perez who told her it was okay that her mother was not present for the conversation. Melissa stated that Perez asked if she knew the Garaases and whether she ever was touched by them. She said "no." Melissa denied ever being touched by the Everetts. Melissa stated Perez told her Idella Everett said she had touched Melissa. Melissa

told Perez that Idella was lying. Melissa claimed that Perez repeatedly told her she was lying in denying sexual abuse, but Melissa never made any allegation of abuse.

Plaintiff's "supplemental proof" shows that the Wenatchee Police Department did undertake an investigation concerning the Henkel children. In an August 29, 1995 memorandum from Wenatchee Police Captain Murray to Chief Badgley, Murray advised that "[w]ithout the assistance of Brenda Welch in allowing Sergeant Smith to talk with her children, Brian and Melissa, this complaint cannot be sustained nor determined to be unfounded." (Ex. A to Ct. Rec. 225 at pp. 000001 and 000002). Sgt. Smith, in a memo to Captain Murray dated August 28, 1995, advised that "[d]ue to the unwillingness of Brenda Welch to follow-through on this complaint, I will not be investigating it any further at this time." (*Id.* at 000003 and 000004).

· According to plaintiff, Badgley tolerated Child Protective Services (CPS) installing Melinda Everett, another alleged "sex ring victim," into the Perez foster home in June 1995, when he simply could have removed Perez from the investigation. It is true that Melinda Everett was placed in the Perez home and remained there until December of 1995. Badgley was aware of this, but says he relied on the prosecutors who did not think it was an insurmountable problem. (Ex. C to Ct. Rec. 225 at pp. 10–12, 15–16, 49–50). Donna Everett, Melinda's sister, was already in foster care in the Perez home. Both the Everett girls made allegations of abuse against their parents, Harold and Idella Everett, in late 1994 which resulted in the arrests of their parents and charges against them. Donna made the allegations at a time when she was already in the foster care of Perez. (Plaintiff's Ex. 37). Donna, of course, also made allegations about plaintiff Gausvik

which were discussed in the court's September 16, 2002 summary judgment order.

In its summary judgment order, this court discussed an investigation undertaken by the Wenatchee Police Department in response to complaints about Perez made by a Robert Kinkade:

Plaintiff singles out several exhibits as proof of Badgley and Tilly's alleged culpability. Plaintiff's Ex. 148 is a copy of a March 28, 1995 letter from Tilly to a Robert Kinkade. Tilly acknowledges receiving a letter from Kinkade containing a list of complaints against Perez. Tilly states he contacted Badgley to investigate the complaints and Badgley advised that Captain Murray had completed an earlier investigation of Perez which did not sustain Kinkade's complaint. Tilly stated he would ask the police chief (Badgley) to investigate any 'new' issues. Kinkade alleged that Perez had used improper interview techniques with regard to Kimberly Allbee. Captain Murray assigned a Sgt. Magnotti to review Kinkade's complaint. Kinkade supplied Magnotti with a videotape of Allbee being interviewed by a George Wimberly in which Allbee recanted the abuse she had previously disclosed to Perez. In his March 17, 1995 report to Badgley (Ex. N to Supplemental Declaration of Patrick McMahon), Murray indicated that Magnotti, who is 'very knowledgeable with established interview techniques and legal requirements regarding the reporting and investigation of child abuse cases,' reviewed the videotape and concluded Wimberly used improper techniques in interviewing Allbee. Magnotti also reviewed Perez's investigative reports and spoke with the CPS caseworker and the school principal who were present during Perez's interview of Allbee. Magnotti did not find any improper interview techniques on the part

of Perez. Murray indicated he had spoken with Magnotti about his findings and based on Murray's own knowledge of acceptable interview techniques in child abuse cases, Murray agreed that Kinkade's complaint could not be sustained. The court fails to see how Kinkade's complaint and the investigation thereof is probative evidence of either Tilly or Badgley being aware of and condoning Perez's alleged unconstitutional actions regarding Mr. Gausvik and the particular circumstances of his case.

(Order at p. 1101).

Plaintiff alleges this court erred in not accepting the inference that Magnotti "was biased and had no intention of concluding that Perez was using improper interview methods." Plaintiff refers to an internal memo from Magnotti to "Chief, Captain Murray" dated February 16, 1995 (Ex. A to Ct. Rec. 225 at p. 000015). This memo from Magnotti to Murray states:

> After talking to [CPS Caseworker Tim] Abbey, he told me they have not been able to locate Kimberly, as they have a pickup order on her. I tried to call Kinkade back on his cell phone which he told me was tied into his house, and low (sic) and behold, Bob Devereaux answered. Devereaux now thinks I am investigating Det. Perez and that I'm his pal, too. Possibly, they'll remain dumb enough to tell me where Kim is so I can talk to her and pick her up for Abbey.

According to plaintiff, this memo shows the investigation was performed by an officer (Magnotti) who was involved in the conduct complained of, per the Henkel children as discussed above, "and who had no intention of actually investigating Perez." [6] Plaintiff contends Magnotti's internal memo was a record which could have easily been accessed by Badgley. At his

deposition in July 2002, Badgley testified he was uncertain whether he had ever seen this memo before. Asked whether he thought the memo gave him concern whether the investigation was being conducted by an unbiased person, Badgley responded that all he "read into it" was that Magnotti was trying to locate "this Kimberly." (Ex. C to Ct. Rec. 225 at pp. 37–38).

In his March 17, 1995 memo to Chief Badgley regarding Kimberly Allbee, Captain Murray advised an attempt had been made to re-interview Allbee about Perez's interrogation, but she could not be located. The memo recited that Allbee had been removed from her mother's custody by CPS and placed with her father and that her father also could not be located. Accordingly, Murray concluded:

> I have reviewed Sgt. Magnotti's investigation I have discussed with Sergeant Magnotti his reporting (sic) and findings. I personally have knowledge of acceptable interview techniques regarding child abuse cases. Given this **and the fact Kimberly Allbee has not been located to be re-interviewed**, Mr. Kinkade's complaint is not sustained.

(Ct. Rec. 225 at p. 000010) (Emphasis added).

While the words Magnotti chose to use in his February 16, 1995 memorandum to Captain Murray may not have been the most appropriate, Magnotti's intentions were appropriate. He wanted to re-interview the girl in an attempt to ascertain whether Perez had coerced her into making allegations of sexual abuse. He also wanted to locate the girl for CPS worker Abbey because she had been removed from her mother's home by CPS and

---

**6.** The incident with the Henkel children occurred in August 1995, several months after

Kinkade's allegations regarding Kimberly Allbee.

**1118**

placed with her father, and then both the father and the girl had disappeared.

In his February 17, 1995 "Incident Report," Magnotti stated:

Kinkade and Devereaux are under the impression that I am conducting a 'secret' investigation of Det. Perez, without the department administration['s] knowledge or consent. I have fostered this impression in hopes of having an opportunity to meet and interview Wimberly if he ever returns to area.

(Ex. C to Ct. Rec. 225 at p. 000021). As noted above, Wimberly is the individual who interviewed Allbee after Perez had interviewed her in February 1995. During her interview with Wimberly, Allbee stated that Perez had coerced her into making allegations of sexual abuse. Wimberly was apparently a member of an organization known as VOCAL (Victim of Child Abuse Laws). In his February 16, 1995 memo, Magnotti states that after reviewing the videotape of Wimberly's interview with Allbee, he (Magnotti) called Kinkade and learned that Wimberly had since flown to California. (Ex. C to Ct. Rec. 225 at pp. 000015). In another "Incident Report" from March 2, 1995, Magnotti refers to Wimberly as "the suspect" (p. 000025), suggesting Wimberly was a suspect regarding the alleged abuse of Allbee.

Apparently after Murray reported to Badgley in March 1995 that Allbee's allegation of coercion by Perez could not be sustained, Robert Kinkade advised Mayor Tilly that there were some other allegations concerning Perez. Tilly, in turn, advised Badgley and Murray of these allegations and requested an investigation. This would have been at the end of March 1995 or in early April 1995. (Ex. A to Ct. Rec. 225 at pp. 000006–000008). There is nothing in the record indicating the specific nature of these additional allegations. At his deposition, Murray testified he wrote a letter to Kinkade dated April 3, 1995 asking for information "on the 30 issues that he [Kinkade] presented." Murray was asked whether subsequent to April 3 he prepared a memo to Badgley reporting findings regarding Kinkade's additional allegations. Murray's response was "[n]ot to my knowledge." Murray speculated that he may have been waiting for additional information from Kinkade which he did not receive. (Ex. B to Ct. Rec. 225 at pp. 25, 26, 28 and 31).

Plaintiff's motion for reconsideration discusses the "Glassen matter" as another example of Badgley's alleged failure to respond to Perez's coercive interview techniques. Plaintiff's previous memorandum of authorities in opposition to defendants' motion for summary judgment contained no discussion of the "Glassen matter," although, as it turns out, plaintiff did bury it in his accompanying statement of material facts.

Glassen was a social worker with Washington Department of Social and Health Services (DSHS) in 1994. In August 1994, Glassen was criminally charged in Chelan County with tampering with a child witness in the criminal investigation of Robert Devereaux. Glassen allegedly persuaded the child (Annie Rodriguez) to recant allegations of abuse she had previously made to Perez. (Plaintiff's Ex. 119). The charge against Glassen was eventually dismissed in February 1995, apparently for insufficiency of evidence, and Glassen subsequently filed a lawsuit against Perez, among others, sometime in 1995, alleging that the charges against him had been fabricated. (Ex. 120). At his July 2002 deposition, Badgley testified he knew Glassen, but could not recall that he had been investigated for tampering with a witness. Badgley testified he did not recall knowing anything about this in 1995. (Ex. C to Ct. Rec. 225 at pp. 45–46).

## 2. Custom

Governmental liability can be imposed when conduct reflects "practices of ... officials permanent and well-settled as to constitute a 'custom or usage' with the force of law." *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "Custom" differs from "policy" in that it is not necessary that the custom has received formal approval through the municipality's official decisionmaking channels. *Id.* at 690–91, 98 S.Ct. 2018. Acts of omission, as well as commission, can serve as the basis for finding an unconstitutional policy or custom. *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir.1992).

In "custom" cases, liability is attributed through a policymaker's actual or constructive knowledge of and acquiescence in the unconstitutional custom or practice. *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 511 (7th Cir.1993). According to the Ninth Circuit in *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443–44 (9th Cir.1989):

> ... a local government may be liable for its custom irrespective of whether official policymakers had actual knowledge of the practice at issue. The existence of custom as the basis for liability under § 1983 thus serves a critical role in insuring that local government entities are held responsible for widespread abuses or practices that cannot be affirmatively attributed to the decisions or ratification of an official policymaker but are so pervasive as to have the force of law.

(Emphasis added).

In support of his "custom" argument, plaintiff discusses the "numerous declarations from children detailing the abusive

and coercive tactics employed by Perez over the years." Plaintiff says these declarations "show a consistent and widespread pattern of abusive conduct by Perez over an extended period of time." Plaintiff also mentions the Declaration of Travis Garaas (Ct.Rec.87) filed in this litigation and executed in June 2002 which gives Travis' version of his May 30, 1995 interview by Perez. Plaintiff asserts, however, that even more important is the declaration by attorney William G. Parker filed in the Douglas County criminal case of *State v. Roberson*. (Plaintiff's Ex. 12). That declaration was executed on October 29, 1995, just a few days before Gausvik was convicted on November 2, 1995. The declaration recites that Parker participated in an interview of Travis on October 9, 1995 at which Travis recounted his earlier interview by Perez, his denial of abuse by his parents, and Perez's insistence that Travis was not telling the truth. This affidavit contains nothing more than hearsay and plaintiff has not argued that any hearsay exceptions apply.

## 3. Ratification

In its September 16, 2002 summary judgment order, this court discussed "ratification" as a theory for municipal liability (Order at pp. 1103–1104), although plaintiff never specifically mentioned it in his memorandum in opposition to defendants' motion for summary judgment.[7] Plaintiff now does specifically mention it in his motion for reconsideration.

According to plaintiff:

> Badgley ... was charged with knowledge of the Henkel declarations filed in open court and also the Parker declara-

---

7. To show ratification, a plaintiff must prove that "authorized policymakers approve a subordinate's decision and the basis for it." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir.1999), quoting *City of St. Louis v. Praprot-*

*nik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Ratification, requires, among other things, knowledge of the alleged constitutional violation. *Id.*

tion filed in open court. The investigative file also reveals that [Badgley] was aware of various/other allegations, and was also aware that the allegations were not proven to be false. Badgley acknowledged that he was aware of the media reports, and the allegations pertaining to Perez acting as both foster parent and investigator. Badgley is also charged with the knowledge of the additional allegations of abusive interview tactics exposed in the various criminal trials, such as the Doggett trial that took place before Mr. Gausvik's case. Badgley had knowledge of Perez' conduct, and by his failure to take any supervisory steps whatsoever to further train or discipline Perez, Badgley ratified Perez' conduct . . . .

The declarations of the Henkel children have been discussed above. Those were submitted in the Chelan County criminal case, *State v. Devereaux,* and signed by the Henkel children on August 29, 1995, which would have been just a couple of months before Gausvik was convicted. The Henkel matter was investigated. The children's allegations could not be sustained because their mother would not make them available to the investigator.

The "Parker declaration" has also been discussed. It was executed on October 29, 1995, just a few days before Gausvik was convicted, and it presents obvious hearsay problems.

With one exception, plaintiff does not inform the court what criminal trials exposed Perez's alleged abusive tactics so as to put Badgley on notice there was a problem prior to Perez's investigation of Gausvik. With regard to the exception, that being the Doggett trial, plaintiff does not

say when that took place[8] and precisely what was revealed. The investigation and arrest of the Doggett parents (Mark and Carol) appears to have taken place in December 1994. (Plaintiff's Exs. 127, 128 and 151).

### 4. Summary

What the court has discussed above represents a much more thorough and coherent discussion of the plaintiff's proof regarding municipal liability than he has ever provided in his multiple submissions to this court. Plaintiff essentially throws everything up against the wall and tells the court it will see for itself there is a genuine issue of material fact that Badgley knew or should have known as early as 1995 that Perez was coercing children into making false allegations of sexual abuse.[9]

There were citizen complaints and media criticism in late 1994 and early 1995. The proof submitted by plaintiff, however, is not sufficient to raise a genuine issue of material fact that Badgley knew or should have known that Perez was coercing children into making false allegations of abuse at that time which would, in turn, lead to the conviction of Gausvik in 1995. Badgley did not have to take the media reports at face value. Investigations were undertaken in response to citizen complaints. With regard to the Henkel children, their mother would not cooperate in making them available to be interviewed by the investigator. With regard to Kimberly Allbee, she could not be located to be re-interviewed. A reasonable inference cannot be drawn that Sgt. Magnotti was biased in conducting the Allbee investigation. Mr. Kinkade apparently had other

---

**8.** Plaintiff's Ex. 34, however, indicates it may have been in April 1995, which is approximately the time that Gausvik initially came under Perez's scrutiny.

**9.** As discussed above, Tilly is not part of the inquiry because plaintiff has not provided proof that Tilly was Perez's supervisor or that Tilly was a policymaker regarding police interview techniques.

complaints, but the record does not indicate the nature of those other complaints or if Kinkade ever supplied the additional information requested by the Wenatchee Police Department. Finally, many, if not all, of the children who accused Perez of coercion did not officially recant their allegations until well after Gausvik was convicted.

The court remains unpersuaded there is a genuine issue of material fact that Badgley knew or should have known of constitutional violations by Perez prior to the Gausvik investigation, arrest and conviction, such as would give rise to potential municipal liability under 42 U.S.C. § 1983.

## C. State Law Claims Statutes of Limitations

Plaintiff seemingly contends this court clearly erred in finding the applicable statutes of limitations barred all of his state law claims [10], or that this finding creates a manifest injustice warranting reconsideration.

■ According to plaintiff, the statutes of limitations were tolled in his case pursuant to RCW 4.16.190 because the criminal judgment and sentence against him were vacated due to constitutional violations and therefore, rendered void. RCW 4.16.190 provides:

If a person entitled to bring an action mentioned in this chapter ... be at the time the cause of action accrued ... imprisoned on a criminal charge prior to sentencing, the time of such disability shall not be a part of the time limited for the commencement of the action.

Once again, plaintiff relies on *Horn v. Bailie*, 309 F.2d 167 (9th Cir.1962), in contending that all of the time he was incarcerated from 1995 through 2000 tolled the statutes of limitation. In its September 16, 2002 summary judgment order, this court had the following to say about *Horn:*

> In [*Horn*], the plaintiff brought a § 1983 civil rights action alleging the defendant police officers tricked him into confessing to a murder in 1935 which he did not commit. The plaintiff was convicted and sentenced to life imprisonment. In July 1959, he was released from prison by a writ of habeas corpus and in July 1961, he commenced his civil rights action for damages from alleged violation of his constitutional rights. The Ninth Circuit observed that Washington state law provided the applicable statute of limitations which was three years. While plaintiff's civil rights action was brought within three years from his discharge from prison, the question was whether the statute had been tolled during his imprisonment. Citing the prior version of RCW 4.16.190, the defendants argued that since the plaintiff had been imprisoned 'in execution under the sentence of court' for a term of life imprisonment, and not 'for a term less than his natural life,' the statute of limitations was not tolled. The Ninth Circuit disagreed, finding that since the sentencing court had been without jurisdiction, the sentence was void and plaintiff's imprisonment was not in execution of a sentence, but was 'on a criminal charge' and therefore, the statute of limitations was tolled. 309 F.2d at 168. The defendants argued the sentence was not void on its face but merely voidable and that until the sentence was set aside by court action, it remained valid and enforceable. The circuit found such a distinction 'inappropriate' because '[w]hether its invalidity appeared on its face or not, it is now well recognized that a sentence obtained

through violation of constitutional rights is a nullity.' *Id.*

What the Ninth Circuit did in *Horn* was to ignore plaintiff's sentence and rely on that portion of the older version of RCW 4.16.190 which tolled the statute of limitations while plaintiff 'was imprisoned on a criminal charge.' The current version of RCW 4.16.190 tolls the statute of limitations while a person is 'imprisoned on a criminal charge' but only 'prior to sentencing.' The current version of the statute has also eliminated the language from the prior version that tolling occurs while an individual is 'in execution under the sentence of a court for a term less than his natural life.'

(Order at pp. 1105 – 1106).

The prior version of RCW 4.16.190 provided that a limitations period was tolled while an individual "was imprisoned on a criminal charge, or in execution under the sentence of a court for a term less than his natural life." Plaintiff contends the amendment of RCW 4.16.190 in 1993 is irrelevant to the *Horn* decision because his criminal sentence "was vacated due to constitutional violations, rendering his sentence a nullity" and therefore, between 1995 and 2000 he was "imprisoned on a criminal charge prior to sentencing" as set forth in the present version of RCW 4.16.190.

Initially, the court notes that the four convictions on which plaintiff remained incarcerated until June 2000 were not "vacated for constitutional reasons." The State voluntarily dismissed those charges.[11] Furthermore, this court simply does not believe it clearly erred in its analysis of the impact of a 1962 Ninth Circuit decision on a tolling provision which was amended some thirty years later.

Defendant cites *Gowin v. Altmiller,* 663 F.2d 820 (9th Cir.1981). In that case, the Ninth Circuit held the plaintiffs' 42 U.S.C. § 1983 claims were barred by the applicable Idaho statute of limitations (three years) and found that Mr. Gowin's imprisonment did not toll the limitations period. The Idaho statutory tolling provision in question was similar to the old version of RCW 4.16.190 in providing that the time during which a person was "imprisoned on a criminal charge, or in execution under the sentence of a criminal court for a term less than for life" did not count against the limitations period.

The Ninth Circuit found the cause of action arose when Mr. Gowin was arrested in July 1974. The incarceration associated with that arrest terminated the following day when Gowin was released. His subsequent imprisonment after his trial in December 1974 therefore, began after the cause of action accrued. *Id.* at 823. According to the circuit:

> While there seem to be no Idaho cases dealing with the issue, authority from other states is apparently unanimous that such a statutory provision does not toll limitations for causes of action already in existence when the imprisonment began.

*Id.* In a footnote, the circuit stated *Horn* was not to the contrary since that case involved a claim that arose during imprisonment, and the only issue was whether the plaintiff was imprisoned on a criminal charge (which would toll the statute) or was under a life sentence (which would not). *Id.,* n. 1.

*Gowin* neither supports or is contrary to this court's analysis of the impact of *Horn* with regard to the current version of RCW 4.16.190. *Gowin,* however, may raise an

---

11. Two of plaintiff's six total convictions were reversed by the Washington Court of Appeals in January 1998 for speedy trial violations under the Washington Superior Court Criminal Rules. *State v. Ralph Vernon G.,* 90 Wash. App. 16, 950 P.2d 971 (1998).

additional issue which this court had not thought of before and that concerns when plaintiff's state law causes of action actually accrued. This court had more or less assumed it was from the date of his conviction in November 1995. This court indicated in its September 16, 2002 summary judgment order (n. 39 at p. 1105) that the time Gausvik was imprisoned prior to sentencing (between the date of his conviction on November 2, 1995 and the date of his sentencing on December 21, 1995) would not be included in the limitations period per the current version of RCW 4.16.190. Gausvik was arrested in July 1995. He has never indicated that he was confined continuously from the date of his arrest until the date of his conviction. Arguably then, Gausvik's state law causes of action accrued at the time of his arrest and before his imprisonment began. Accordingly, per *Gowin,* neither version of RCW 4.16.190 (before 1993 or after 1993) would toll the statutes of limitations applicable to plaintiff's state law causes of action (false arrest, false imprisonment, intentional or negligent infliction of emotional distress, negligence). Both versions refer to imprisonment "at the time the cause of action accrued."

■ In his motion for reconsideration, plaintiff contends that *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), and decisions from the Ninth Circuit and elsewhere "hold that the § 1983 claim, and any related state law claims, do not accrue until the conviction is overturned." That is definitely true with regard to § 1983 claims because **federal law** determines when those claims accrue. (See discussion at pp. 1083 – 1084 and 1105 of September 16, 2002 summary judgment order). That, however, is not true with regard to state law claims because **state law** determines when those claims accrue. The authorities cited by plaintiff are not to the contrary. *Uboh v. Reno,* 141 F.3d 1000 (11th Cir.1998), involved a federal *Bivens* action. *Harvey v. Waldron,* 210 F.3d 1008 (9th Cir.2000), was a § 1983 action. *Cabrera v. City of Huntington Park,* 159 F.3d 374 (9th Cir.1998), involved § 1983 claims for false arrest, false imprisonment and malicious prosecution. *Alvarez–Machain v. U.S.,* 107 F.3d 696 (9th Cir.1996), involved application of *Heck* to a § 1983 cause of action and application of federal equitable tolling principles to a cause of action under the Federal Tort Claims Act. Plaintiff is simply *wrong* in claiming that "[f]ederal courts have ruled that state law claims are also barred or preserved by *Heck.*"

■ Finally, in his motion for reconsideration, plaintiff asserts that assuming the 1993 version of RCW 4.16.190 does not toll the applicable statutes of limitations on his state law claims, that amounts to a violation of his equal protection rights under the Washington State Constitution, Article I, Section 12.[12] Plaintiff contends there is no rational basis for RCW 4.16.190 to toll a limitations period for those imprisoned prior to sentencing, but to not toll it for those imprisoned after sentencing. This equal protection argument is one that is asserted for the first time in plaintiff's motion for reconsideration. As this court has already observed, motions for reconsideration are not the proper vehicle for offering evidence or theories of law that were available at the time of the initial ruling.

Although the court is not obligated to address the equal protection argument, it is inclined to believe RCW 4.16.190 passes the rational basis test and the Washington Supreme Court would concur in that as-

---

**12.** Article I, Section 12 provides:
 No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens or corporations.

sessment. It is rational for the state legislature to find that those imprisoned prior to conviction and sentencing are "disabled" from pursuing civil claims because their attention must be focused on preparing for trial and sentencing, whereas those who have already been convicted and sentenced no longer have that more immediate concern.

Moreover, an individual who has been convicted, sentenced and imprisoned, can file a civil lawsuit and ask that it be stayed pending the outcome of his appeals or petitions for post-conviction relief (assuming the civil claims relate to the conviction). *Falkner v. Foshaug,* 108 Wash.App. 113, 116–117 n. 2 and n. 5, 29 P.3d 771 (2001). In *Falkner,* the plaintiff was convicted in 1993 for murder. In 1996, he brought a malpractice lawsuit against the attorney who had represented him during the criminal proceeding. This lawsuit was held in abeyance when in 1997, the Washington Court of Appeals reversed plaintiff's conviction for ineffective assistance of counsel and remanded for a new trial. The murder case went to trial for a second time in 1998, but did not go to jury because the plaintiff entered an *Alford* plea to a reduced charge of manslaughter. After this plea, the plaintiff renewed his civil malpractice suit.

Plaintiff cites *Elliott v. City of Union City,* 25 F.3d 800 (9th Cir.1994), in support of his equal protection argument. The issue there was whether a California disability statute tolled the statute of limitations when a plaintiff, suing under 42 U.S.C. § 1983 to recover for injuries suffered during an arrest, had been held in continuous custody from the time of that arrest through the period of his incarceration following conviction. The Ninth Circuit held the statute of limitations applicable to the plaintiff's § 1983 action was tolled commencing with his arrest and continuing through his custody.

The California disability statute at issue was very similar to the pre–1993 version of RCW 4.16.190 in providing that the statute of limitations was tolled when a person is "[i]mprisoned on a criminal charge, or in execution under sentence of a criminal court for a term of less than for life." Under the California disability statute, the statute of limitations was tolled only if the disability existed at the time the claim accrued. The plaintiff in *Elliott* had remained in police custody from the time of his arrest, when his excessive force claim accrued, until he was convicted and sent to prison and therefore, the critical issue was whether being continuously incarcerated prior to arraignment constituted being "imprisoned on a criminal charge" within the meaning of the California disability statute.

The circuit noted that in *Bianchi v. Bellingham Police Dept.,* 909 F.2d 1316, 1318 (9th Cir.1990), it had dealt with a nearly identical Washington disability statute (the pre–1993 version of RCW 4.16.190) and concluded that a Washington inmate who had been continuously imprisoned since his arrest could benefit from tolling with respect to claims accruing during the arrest. According to the circuit:

> As the *Bianchi* court explained, the purpose of disability statutes would be ill-served by creating an arbitrary distinction between pre-and post-arraignment incarceration. [Citation omitted]. Disability statutes are meant to 'protect those who are incapable of protecting themselves,' [citation omitted]: they apply to prisoners in recognition of their more limited ability to investigate their claims, to contact lawyers and to avail themselves of the judicial process. [Citations omitted]. A person held in police custody prior to arraignment is

faced with the same limitations as someone in *custody after arraignment.*

25 F.3d at 803.

The circuit added:

In terms of limitations on the prisoner, continuous custody is the relevant disability. For tolling purposes, there is little difference between being incarcerated pre-arraignment, pre-conviction or post-conviction: none of these forms of custody affords the prisoner a change in status with regard to his disability. To hold that pre-conviction tolling does not continue post-conviction would be inconsistent with the policy behind the tolling statute.

*Id.*

While *Elliott* may lend some support to plaintiff's equal protection argument, the fact is that it, and *Bianchi,* dealt with disability statutes different from the version of RCW 4.16.190 which is currently effective in the State of Washington. The present version of RCW 4.16.190 states plain and simple that the disability applies only to those "imprisoned on a criminal charge prior to sentencing." The pre-1993 version of RCW 4.16.190 and the California disability statute at issue in *Elliott* provided for tolling while the individual was imprisoned on a criminal charge, or in execution of a sentence. Those statutes already provided for post-conviction tolling and therefore, the Ninth Circuit was not presented with a specific equal protection issue. Furthermore, this court is not even certain that Gausvik, like the plaintiffs in *Bianchi* and *Elliott,* was continuously in custody from the time of his arrest through his conviction and thereafter.

## III. CONCLUSION

This court does not believe it clearly erred or created a manifest injustice in finding as a matter of law that the City of Wenatchee is not liable on plaintiff's § 1983 claims and that plaintiff's state law claims are barred by the applicable statutes of limitations. Accordingly, plaintiff's Motion for Reconsideration (Ct.Rec.248) is **DENIED.**

**IT IS SO ORDERED.** The District Executive is directed to enter this order and forward copies to counsel.