Mark **DOGGETT** and Carol Doggett, and their marital community; John E. Doggett, a single person; Elizabeth Foster (F/K/A Elizabeth Doggett); Amber Doggett, a single person, Meghan Doggett, a minor, Plaintiffs,

v.

Robert Ricardo **PEREZ**, individually and in his official capacity; Kenneth C. Badgley, individually and in his official capacity; City of Wenatchee, a municipal corporation; Roy Fore, individually and in his official capacity; Chelan County, a municipal corporation, Defendants.

No. CS–02–282–AAM.

United States District Court, E.D. Washington.

May 28, 2004.

---

Robert Craig Van Siclen, Tyler K. Firkins, Van Siclen Stocks & Firkins, Auburn, WA, for Plaintiffs.

Patrick G. McMahon, Carlson Mcmahon & Sealby PLLC, Wenatchee, WA, John Francis Kennedy, Law Office of John Francis Kennedy, Gig Harbor, WA, for Defendants.

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

MCDONALD, Senior District Judge.

**BEFORE THE COURT** is the motion of defendants Perez, Badgley and City of Wenatchee for partial summary judgment on the 42 U.S.C. §§ 1983 and 1985 claims of plaintiffs Mark and Carol Doggett, Elizabeth Foster, and Amber Doggett[1] (Ct. Rec.20).[2]

## I. FACTS

Robert Ricardo Perez ("Perez") is a former City of Wenatchee police officer.

Kenneth C. Badgley, at all material times to this lawsuit, was the Chief of the Wenatchee Police Department, having served as chief since September 1978.

On January 1, 1994, Perez was appointed to the Detective Unit of the Wenatchee Police Department. He was assigned to be the detective in charge of crimes against persons which included investigation of child abuse, both physical and sexual abuse. This was a two year rotational assignment and on December 31, 1995, Perez went back to being a patrol officer.

Perez received some training in child sex abuse investigations. He attended a three day, twenty-one hour seminar put on for the prosecutors and law enforcement personnel in Wenatchee from December 1, 1993 to December 3, 1993. In May 1994, Perez attended the five day, forty hour Washington State Criminal Justice Training Course on investigating child abuse.

On December 15, 1994, Perez and CPS (Child Protective Services) Supervisor, Tim Abbey, interviewed Elizabeth Doggett at Orchard Middle School. This interview was prompted by information Perez had received from Elizabeth Doggett's therapist, Cindy Andrews.

During the interview, Elizabeth Doggett stated that her brother John had fondled her and had intercourse with her.

Perez and Abbey then interviewed John Doggett at Orchard Middle School. John confirmed he had been having sexual contact with Elizabeth.

On December 18, 1994, Perez was informed that John Doggett had been sent to live with his aunt in Moses Lake, Washington.

On December 28, 1994, Abbey and Perez went to Moses Lake to talk to John. Abbey and Perez transported John to the CPS office in Moses Lake. At that time, John disclosed several incidents of sexual assault involving local males. According to

---

**1.** In a previous order, defendants Perez, Badgley and City of Wenatchee were awarded summary judgment on the §§ 1983 and 1985 claims of John Doggett since those claims are barred by the applicable statutes of limitation (Ct.Rec.50). Meghan Doggett has voluntarily dismissed all of her claims against the defendants (Ct.Rec.96). her claims against the defendants (Ct.Rec.96).

**2.** Defendants' motion to file an overlength reply brief (Ct.Rec.87) is **GRANTED**.

Perez's police report, John also admitted having sexual contact with his sister Sarah (aka Sam). According to the report, John also disclosed having sexual contact with his parents and indicated his parents had sexual contact with each of his sisters (Sarah, Elizabeth, Amber and Meghan).

Abbey and Perez then returned to Wenatchee and contacted Mark and Carol Doggett at their residence. Abbey and Perez had Amber and Meghan Doggett transported to the Wenatchee Police Department where they were interviewed by Abbey and Perez. Both Amber and Meghan acknowledged having sexual contact with their parents.

Following that, Mark and Carol Doggett were arrested on December 28, 1994 and charged with sexually abusing their children.

On January 17, 1995, Perez and Pat Boggess interviewed Elizabeth Doggett. During this interview, Elizabeth wrote out a statement indicating her parents had sexually abused her.

On April 28, 1995, Mark and Carol Doggett were each convicted by a Chelan County Superior Court jury of one count of rape of a child in the first degree and one count of complicity to commit child molestation in the first degree.[3]

On June 23, 1995, Mark and Carol Doggett were each sentenced to a term of imprisonment of 85 months on the complicity count and a term of 130 months on the rape count.

On December 9, 1997, the convictions of Mark and Carol Doggett were reversed by the Washington Court of Appeals, Division III, and their cases remanded to Chelan County Superior Court for retrial.

The Chelan County Prosecutor moved for reconsideration and the court of appeals denied that motion in an order filed January 27, 1998.

The Chelan County Prosecutor then filed a petition for review before the Washington Supreme Court. The supreme court granted the petition in an order filed October 2, 1998, and remanded the matter to the court of appeals for further reconsideration in light of new caselaw.

On September 14, 1999, the court of appeals issued a modified opinion, but which still adhered to its earlier opinion reversing the Doggetts' convictions and remanding their cases for retrial.

The Chelan County Prosecutor then filed a petition for review of the court of appeals' modified opinion. On April 6, 2000, the state supreme court denied the petition.

Subsequently, the court of appeals issued a mandate on April 20, 2000, certifying that its opinion filed on September 14, 1999 became the "decision terminating review by this court ... on *April 6, 2000.*" (Emphasis in original). The mandate specified the causes were being remanded to Chelan County Superior Court for further proceedings in accordance with the September 14, 1999 opinion.

Following issuance of the mandate, the Chelan County Superior Court dismissed all of the charges against the Doggetts.

## II. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). Under Fed. R.Civ.P. 56, a party is entitled to summary judgment where the documentary evidence

---

**3.** Mark and Carol Doggett were convicted only of the charges involving their daughter Meghan. *State of Washington v. Carol M.D.,* 89 Wash.App. 77, 83, 948 P.2d 837 (1997).

produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Semegen v. Weidner,* 780 F.2d 727, 732 (9th Cir.1985). Summary judgment is precluded if there exists a genuine dispute over a fact that might affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The moving party has the initial burden to prove that no genuine issue of material fact exists. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In ruling on a motion for summary judgment, all inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. Nonetheless, summary judgment is required against a party who fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual disputes regarding other elements of the claim. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

### III. DISCUSSION

The alleged constitutional violations here involve "deliberate fabrication of evidence"

by defendant Perez to obtain the arrest and conviction of the Doggetts. This alleged fabrication of evidence occurred because of what plaintiffs assert were coercive and abusive interviews of the Doggett children conducted by Perez.

■■■ There is a "clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux v. Abbey,* 263 F.3d 1070, 1074–75 (9th Cir. 2001). In order to support a claim for deliberate fabrication of evidence, a plaintiff must, at a minimum, produce evidence that supports one of the following propositions: (1) the defendants continued their investigation of an individual despite the fact that they knew or should have known he was innocent; and (2) defendants used investigative techniques that were so coercive and abusive that they knew or should have known those techniques would yield false information. *Id.* at 1076.

The evidence and argument offered by plaintiffs here is for the most part, similar to the evidence and argument offered by the plaintiff in *Gausvik v. Perez,* 239 F.Supp.2d 1067 (E.D.Wash.2002) and 239 F.Supp.2d 1108. This court found that evidence was insufficient to raise a genuine issue of material fact that the City of Wenatchee or Badgley could be held liable for alleged deliberate fabrication of evidence by Perez. *Id.* at 1099–1104 and 1111–1121. That evidence fares no better here and the plaintiffs here have failed to materially distinguish the circumstances in their case from those existing in *Gausvik.*[4]

4. Defendant Perez is a party to this motion for summary judgment only to the extent that he apparently seeks judgment on the conspiracy claim alleged against him and the other defendants. This motion does not seek summary judgment for Perez on the basis that he did not deliberately fabricate evidence or that

he is otherwise entitled to qualified immunity from damages. Obviously, if he did not deliberately fabricate evidence and there is no constitutional violation, there is no municipal liability for the City of Wenatchee or supervisory liability for Badgley. The analysis of

What follows below is largely a repeat of the analysis found in *Gausvik*, although some additional issues are addressed and some additional commentary is offered by the court.

### A. Municipal LiabilityCity of Wenatchee

A municipality or governmental entity cannot be found liable under 42 U.S.C. § 1983 on a *respondeat superior* theory. *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Municipal liability must be established in one of the following ways: 1) by proving that a "city employee committed the alleged constitutional violation pursuant to a formal governmental policy or longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity;" 2) by establishing that the "individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy;" or 3) by proving that "an official with final policymaking authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir.1992). It must also be proven that one of the above circumstances was the cause in fact and the proximate cause of the constitutional deprivation. *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.1996).

Municipal liability results where a policy or custom is the moving force behind the constitutional violation as compared to supervisory liability, discussed *infra*, where an individual is held liable for his own personal conduct which leads to the constitutional harm. See *Larez v. City of Los Angeles*, 946 F.2d 630, 645–46 (9th Cir. 1991).

### 1. Who is a policymaker?

Plaintiffs contend Perez himself was a policymaker by virtue of his assignment as detective in charge of crimes against persons, including investigation of child abuse.

The official policy requirement ("official" by virtue of formal approval or custom) is intended to distinguish acts of the municipality from acts of employees of the municipality so that municipal liability is limited to actions for which the municipality is actually responsible. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). While a single decision may satisfy the "policy" requirement, that decision must have been properly made by one of the municipality's authorized decisionmakers—by an official who "possesses final authority to establish municipal policy with respect to the [challenged] action." *Id.* at 479–81, 106 S.Ct. 1292. Whether an official has final policy-making authority is a question for the court to decide based on state law. *Jett v. Dallas Independent School District*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989).

In *City of St. Louis v. Praprotnik*, 485 U.S. 112, 113, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), the U.S. Supreme Court made an additional attempt to "define the proper legal standard for determining when isolated decisions by municipal officials or employees may expose the municipality itself to liability under § 1983." The Court reiterated that identification of policymak-

---

municipal and supervisory liability contained herein assumes the possibility that Perez may have committed a constitutional violation, recognizing that in at least two other cases, *Gausvik v. Perez*, 345 F.3d 813 (9th Cir.2003), and *Cunningham v. City of Wenatchee*, 345

F.3d 802 (9th Cir.2003), the Ninth Circuit has found no such violation. Obviously, the fact he may have deliberately fabricated evidence does not automatically mean the City of Wenatchee and Badgley are also liable.

ing officials is a question of state law to be decided by the court, and not a jury. *Id.* at 124, 108 S.Ct. 915.

"Authority to make municipal policy may be ... delegated by an official who possesses such authority." *Id.* Special difficulties arise when it is alleged that an official has delegated policymaking authority:

> If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability. If, however, a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose.

*Id.* at 126, 108 S.Ct. 915.

The question is whether the policymaker has merely delegated discretion to act or whether it has done more by delegating final policymaking authority. For example:

> [I]f county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decision *would* represent county policy and could rise to municipal liability.

*Pembaur,* 475 U.S. at 483 n. 12, 106 S.Ct. 1292, 89 L.Ed.2d 452. (Emphasis in text).

■ The authority to make "final" policy must be distinguished from the authority to make discretionary decisions:

When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they retain the authority to measure the official's conduct for conformance with their policies ....

*Praprotnik,* 485 U.S. at 127, 108 S.Ct. 915. (Emphasis in text). For a subordinate's decision to be attributable to the government entity, the authorized policymakers must approve the decision and the basis for it. *Id.* at 129–30, 108 S.Ct. 915.[5] Simply going along with discretionary decisions by subordinates is not a delegation of authority to them to make policy. *Id.*

■ Plaintiffs cite no state law in support of their assertion that Perez acted as a policymaker for the City of Wenatchee such that his decisions constituted official policy of the city. There is no proof the city somehow delegated final policymaking authority to Perez. Accordingly, the court must conclude Perez simply made discretionary decisions as an employee of the city and as a subordinate of Badgley.

### 2. Custom

■ Governmental liability can be imposed when conduct reflects "practices of ... officials permanent and well-settled as to constitute a 'custom or usage' with the force of law." *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "Custom" differs from "policy" in that it is not necessary that the custom has received formal approval through the municipality's official decisionmaking channels. *Id.* at 690–91, 98 S.Ct. 2018. Acts of omission, as

---

5. See "Ratification" discussed *infra.*

well as commission, can serve as the basis for finding an unconstitutional policy or custom. *Oviatt v. Pearce,* 954 F.2d 1470, 1477 (9th Cir.1992).

■ In "custom" cases, liability is attributed through a policymaker's actual or constructive knowledge of and acquiescence in the unconstitutional custom or practice. *McNabola v. Chicago Transit Auth.,* 10 F.3d 501, 511 (7th Cir.1993). According to the Ninth Circuit in *Thompson v. City of Los Angeles,* 885 F.2d 1439, 1443–44 (9th Cir.1989):

> . . . a local government may be liable for its custom irrespective of whether official policymakers had actual knowledge of the practice at issue. The existence of custom as the basis for liability under § 1983 thus serves a critical role in insuring that local government entities are held responsible for widespread abuses or practices that cannot be affirmatively attributed to the decisions or ratification of an official policymaker but are so pervasive as to have the force of law.

(Emphasis added).

■ Assuming Badgley was the final policymaking authority with regard to how the Wenatchee Sex Ring investigation was conducted, the question is whether plaintiff has offered sufficient evidence to raise a genuine issue of material fact that Badgley had actual or constructive knowledge of and acquiesced in an unconstitutional custom or practice.[6]

Plaintiffs offer declarations of numerous children, including from Amber and Elizabeth Doggett, who claim Perez coerced or attempted to coerce them into making false allegations of abuse. Plaintiff also offers hearing testimony from Sarah Doggett from 1998, as well as an April 1996 affidavit from her filed in Chelan County Superior Court, Juvenile Division (Ex. 38 to Declaration of John S. Stocks, Ct. Rec. 79). The affidavit says nothing about Perez and Sarah never made any disclosures regarding abuse by her parents. The declaration of Amber Doggett, in which she relates alleged coercion by Perez, is dated July 2002. It is unclear when she first publicly asserted coercion and recanted allegations of abuse against her parents. *Gausvik v. Perez,* 239 F.Supp.2d at 1114 n. 5. The declaration of Elizabeth Foster f/k/a Doggett is dated April 29, 2004 (Ct. Rec.93). She says that in March and April 1995 she told her counselor Cindy Andrews that Perez had coerced her into accusing her parents of sexual abuse. Those allegations appear to have been made during confidential counseling sessions and there is simply no indication how Badgley could have become aware of said allegations at that time. The court is not aware of any declaration or deposition testimony from John Doggett recanting his allegations that he and/or his siblings were sexually abused by their parents.

The declarations and other testimony of these children is insufficient to raise a genuine issue of material fact that Badgley knew or should have known in 1995 that Perez was deliberately fabricating evidence. With regard to all of these children, with the exception of the Henkels (discussed below), it was a considerable time after the Doggetts were convicted (April 1995) that they publicly alleged Perez coerced or attempted to coerce them into making false allegations of abuse. Moreover, some of the children simply did not make any disclosures of abuse.[7]

---

**6.** It is possible the Mayor and/or the City Police Commission were the final policymaking authorities, although neither are named as defendants in this case and plaintiffs do not specifically offer evidence or argument regarding actual or constructive knowledge of these entities.

**7.** Jessika Still's declaration dates from May 2002 and discusses an interview with Perez

Plaintiff cites *Henry v. County of Shasta,* 132 F.3d 512, 519 (9th Cir.1997), *amended,* 137 F.3d 1372 (9th Cir.1998), in which the Ninth Circuit held that post-event evidence is admissible for proving the existence of a municipal defendant's policy or custom and "may be" highly probative of that inquiry. The post-event evidence in *Henry* consisted of two declarations of individuals who said they had been abused at the Shasta County jail in a fashion similar to that of the plaintiff (Henry). One individual said he had been subject to abuse two to three months after Henry filed his § 1983 action. The circuit found it was "a reasonable inference, indeed the only reasonable inference, that after Henry filed suit and successfully served process against the county, it knew about the alleged malfeasance of its employees at the jail." *Id.* at 518. Another individual was subject to abuse only two and a half months after the plaintiff. According to the circuit, "such close proximity in time of the two events lends further support[ ] to Henry's claim that his treatment was not an isolated event but was instead inflicted in accordance with county policy." *Id.* at 519.

This court has not been made aware that in 1995 when the Doggetts were investigated for abuse and eventually arrested and convicted, there were any pending civil lawsuits against the City of Wenatchee for alleged coercive interviewing techniques by Perez.

Plaintiffs rely on August 1995 declarations of Brian and Melissa Henkel which plaintiffs claim were filed in the Chelan County criminal action, *State v. Devereaux* (Exs. 26 and 27 to Declaration of John S. Stocks In Opposition To Defendants' Motion For Summary Judgment, Ct. Rec. 79). Defendants dispute that the declarations were filed, noting the criminal court docket in *State v. Devereaux* reveals no such declarations. (Ex. 2 to Supplemental Declaration of Patrick McMahon, Ct. Rec. 86). Indeed, the copies of the declarations submitted by plaintiffs do not bear file stamps from the Chelan County Superior Court. Even if they were filed in Chelan County Superior Court in August of 1995, however, that was several months after Mark and Carol Doggett had already been convicted. Moreover, these declarations have no probative value in establishing either actual or constructive knowledge by Badgley that Perez was deliberately fabricating evidence. The reason is simple: despite questioning by Perez and other Wenatchee police officials, specifically Sgt. Mike Magnotti, neither Brian or Melissa Henkel made any disclosures that they had been sexually abused by anyone. *Gausvik,* 239 F.Supp.2d at 1116.

The Wenatchee Police Department did undertake an investigation concerning the Henkel children. In an August 29, 1995 memorandum from Wenatchee Police Captain Murray to Chief Badgley, Murray advised that "[w]ithout the assistance of Brenda Welch in allowing Sergeant Smith to talk with her children, Brian and Melissa, this complaint cannot be sustained nor determined to be unfounded." Sgt. Smith,

from 1994. Clarissa Chavez's declaration dates from September 1999 and discusses an interview with Perez from September 1994. Ultimately, she did not make any disclosures about abuse. Richard Everett testified in a Spokane County Superior Court civil trial in July 2001 (*Rodriguez v. Perez et al;* and *Roberson v. Perez, et al.*). He also testified at the personal restraint petition reference hearings involving his parents, Harold and Idella Ever-

ett, in May 1998. Plaintiff offers deposition testimony from Shawn Everett taken in January 1998. The declaration of Kimberly Allbee is dated October 2001. She discusses an interview with Perez in February 1995. The declaration of Travis Garaas was executed in June 2002 and discusses a May 1995 interview by Perez. Travis did not make any disclosures regarding sexual abuse. See *Gausvik v. Perez,* 239 F.Supp.2d at 1114 n. 5.

in a memo to Captain Murray dated August 28, 1995, advised that "[d]ue to the unwillingness of Brenda Welch to follow-through on this complaint, I will not be investigating it any further at this time." *Id.*

Plaintiffs claim an internal investigation conducted by the Wenatchee Police Department in early 1995 establishes actual or constructive knowledge by Badgley of constitutional improprieties committed by Perez during his Wenatchee Sex Ring investigation. A gentleman named Robert Kinkade complained to the Mayor at the time (Earl Tilly) about how Perez was handling the investigation. Kinkade alleged that Perez had used improper interview techniques with regard to a Kimberly Allbee. Captain Murray of the Wenatchee Police Department assigned Sgt. Magnotti to review Kinkade's complaint. Kinkade supplied Magnotti with a videotape of Allbee being interviewed by a George Wimberly in which Allbee recanted the abuse she had previously disclosed to Perez. In his March 17, 1995 report to Badgley, Murray indicated that Magnotti, who is "very knowledgeable with established interview techniques and legal requirements regarding the reporting and investigation of child abuse cases," reviewed the videotape and concluded Wimberly used improper techniques in interviewing Allbee. Magnotti also reviewed Perez's investigative reports and spoke with the CPS caseworker and the school principal who were present during Perez's interview of Allbee. Magnotti did not find any improper interview techniques on the part of Perez. Murray indicated he had spoken with Magnotti about his findings and based on Murray's own knowledge of acceptable interview techniques in child abuse cases, Murray agreed that Kinkade's complaint could not be sustained. *Id.* at 1116–17.

The court fails to see how Kinkade's complaint and the investigation thereof provided Badgley with actual or constructive knowledge of Perez's alleged unconstitutional actions regarding the Doggetts and the particular circumstances of their case. The investigation pointed to no wrongdoing on the part of Perez.

Plaintiffs allege Magnotti "was biased and had no intention of concluding that Perez was using improper interview methods." The evidence does not bear this out, however. Plaintiff refers to an internal memo from Magnotti to "Chief, Captain Murray" dated February 16, 1995. This memo from Magnotti to Murray states:

> After talking to [CPS Caseworker Tim] Abbey, he told me they have not been able to locate Kimberly, as they have a pickup order on her. I tried to call Kinkade back on his cell phone which he told me was tied into his house, and low (sic) and behold, Bob Devereaux answered. Devereaux now thinks I am investigating Det. Perez and that I'm his pal, too. Possibly, they'll remain dumb enough to tell me where Kim is so I can talk to her and pick her up for Abbey.

According to plaintiffs, this memo shows the investigation was performed by an officer (Magnotti) who was involved in the conduct complained of, per the Henkel children as discussed above, "and who had no intention of actually investigating Perez."

Plaintiffs contend Magnotti's internal memo was a record which could have easily been accessed by Badgley. At his deposition in July 2002, Badgley testified he was uncertain whether he had ever seen this memo before. Asked whether he thought the memo gave him concern whether the investigation was being conducted by an unbiased person, Badgley responded that all he "read into it" was that Magnotti was trying to locate "this Kimberly." *Id.* at 1117.

In his March 17, 1995 memo to Chief Badgley regarding Kimberly Allbee, Captain Murray advised an attempt had been made to re-interview Allbee about Perez's interrogation, but she could not be located. The memo recited that Allbee had been removed from her mother's custody by CPS and placed with her father and that her father also could not be located. Accordingly, Murray concluded:

I have reviewed Sgt. Magnotti's investigation I have discussed with Sergeant Magnotti his reporting (sic) and findings. I personally have knowledge of acceptable interview techniques regarding child abuse cases. Given this and the fact Kimberly Allbee has not been located to be re-interviewed, Mr. Kinkade's complaint is not sustained.

While the words Magnotti chose to use in his February 16, 1995 memorandum to Captain Murray may not have been the most appropriate, Magnotti's intentions were appropriate. He wanted to re-interview the girl in an attempt to ascertain whether Perez had coerced her into making allegations of sexual abuse. He also wanted to locate the girl for CPS worker Abbey because she had been removed from her mother's home by CPS and placed with her father, and then both the father and the girl had disappeared. *Id.* at 1117–18.

In his February 17, 1995 "Incident Report," Magnotti stated:

Kinkade and Devereaux are under the impression that I am conducting a 'secret' investigation of Det. Perez, without the department administration['s] knowledge or consent. I have fostered this impression in hopes of having an opportunity to meet and interview Wimberly if he ever returns to area.

As noted above, Wimberly is the individual who interviewed Allbee after Perez had interviewed her in February 1995. During her interview with Wimberly, Allbee stated that Perez had coerced her into making allegations of sexual abuse. Wimberly was apparently a member of an organization known as VOCAL (Victim of Child Abuse Laws). In his February 16, 1995 memo, Magnotti states that after reviewing the videotape of Wimberly's interview with Allbee, he (Magnotti) called Kinkade and learned that Wimberly had since flown to California. In another "Incident Report" from March 2, 1995, Magnotti refers to Wimberly as "the suspect," suggesting Wimberly was a suspect regarding the alleged abuse of Allbee. *Id.* at 1118.

Apparently after Murray reported to Badgley in March 1995 that Allbee's allegation of coercion by Perez could not be sustained, Kinkade advised Mayor Tilly that there were some other allegations concerning Perez. Tilly, in turn, advised Badgley and Murray of these allegations and requested an investigation. This would have been at the end of March 1995 or in early April 1995. There is nothing in the record indicating the specific nature of these additional allegations. At his deposition, Murray testified he wrote a letter to Kinkade dated April 3, 1995 asking for information "on the 30 issues that he [Kinkade] presented." Murray was asked whether subsequent to April 3 he prepared a memo to Badgley reporting findings regarding Kinkade's additional allegations. Murray's response was "[n]ot to my knowledge." Murray speculated that he may have been waiting for additional information from Kinkade which he did not receive. *Id.*

While there is no reference to Amy Filbeck in plaintiffs' response memorandum, she is referred to in plaintiffs' statement of material facts. As plaintiffs' counsel did in *Gausvik,* here counsel submits a great deal of proof without discussing it in his memorandum of authorities and how it supports

his legal arguments.[8] While that is reason enough for not discussing the proof, the court will nevertheless do so because it did so in *Gausvik.*

Filbeck alleged coercion by Perez during an interview, but apparently intended to complain about another officer, Sergeant Pippen. The interview in question apparently occurred sometime in October 1994 and Filbeck's complaint arose in February 1995. Plaintiff says this evidence shows that other officers were using coercive interview techniques such as would evidence a policy on the part of the City of Wenatchee condoning such techniques. The evidence, however, also shows that Amy was an "adult" at the time of her interview by Pippen and that her complaint was investigated by the Wenatchee Police Department, specifically by Sergeant Magnotti. Pippen denied ever calling Filbeck a liar or raising his voice during the interview. *Gausvik,* 239 F.Supp.2d at 1114–15. The Filbeck investigation would not have provided Badgley with actual or constructive knowledge that **Perez** was coercing **children** into making false allegations of having been sexually abused.

Plaintiff says that in addition to "citizen complaints," Badgley knew or should have known of Perez's coercive interview techniques because of extensive media coverage and criticism of Perez's investigations during 1995. There is no dispute that there was extensive media coverage and criticism. Badgley acknowledged being aware of some of it. As this court stated in *Gausvik,* there was no reason for Badgley to accept the media reports at face value. 239 F.Supp.2d at 1100–01. This is especially so when at the time there had no been recantations of abuse by any of the children interviewed by Perez and the aforementioned investigations had not sug-

gested any wrongdoing by Perez. *Id.* at 1120–21.

Plaintiffs assert the numerous declarations from children who were allegedly subject to coercion by Perez, "coupled with the unrebutted declaration of Dr. Phillip Esplin," raise a genuine issue of material fact that Perez's conduct was so widespread that it constituted a custom of the Wenatchee police department. Dr. Esplin, plaintiff's expert witness, opines that the interview techniques employed by Perez in the Gausvik case "were so coercive and abusive that Perez, and his supervisors who reviewed his reports, knew or should have known, that the interviews would yield false information." Other than this conclusory statement about supervisory liability, however, Esplin does not state how Badgley, simply on the basis of reviewing paper reports from Perez, would have known that Perez was coercing allegations of abuse from the Garaas children. Esplin's opinion is not derived simply from looking at Perez's reports. It is derived from a variety of different documents, in addition to the police reports, such as caseworker notes of the interviews, deposition testimony, trial testimony, declarations, affidavits, etc. *Id.* at 1115.

According to plaintiffs, Badgley tolerated CPS installing Melinda Everett, another alleged "sex ring victim," into the Perez foster home in June 1995, when he simply could have removed Perez from the investigation. It is true that Melinda Everett was placed in the Perez home and remained there until December of 1995. Badgley was aware of this, but says he relied on the prosecutors who did not think it was an insurmountable problem. Donna Everett, Melinda's sister, was already in foster care in the Perez home. Both the

---

8. Indeed, defendants' counsel indicates 66 of plaintiffs' exhibits were not even referred to in plaintiffs' statement of material facts.

Everett girls made allegations of abuse against their parents, Harold and Idella Everett, in late 1994 which resulted in the arrests of their parents and charges against them. Donna made the allegations at a time when she was already in the foster care of Perez. *Id.* at 1116. While the fact that Donna Everett was Perez's foster daughter was certainly a concern, that should not necessarily have led Badgley to believe Perez had coerced or was going to coerce allegations of abuse from the Doggett children. This evidence does not create a genuine issue of material fact that Badgley, as policymaker, had actual or constructive knowledge at the time of the Doggetts' arrest and conviction that Perez had deliberately fabricated evidence against them by means of coercive interrogations of the Doggett children.

Likewise, the "Glassen matter" does not create a genuine issue of material fact that Badgley, as policymaker, had actual or constructive knowledge of wrongdoing by Perez. Paul Glassen was a social worker with Washington Department of Social and Health Services (DSHS) in 1994. In August 1994, Glassen was criminally charged in Chelan County with tampering with a child witness in the criminal investigation of Robert Devereaux. Glassen allegedly persuaded the child (Annie Rodriguez) to recant allegations of abuse she had previously made to Perez. The charge against Glassen was eventually dismissed in February 1995, apparently for insufficiency of evidence, and Glassen subsequently filed a lawsuit against Perez, among others, sometime in 1995, alleging that the charges against him had been fabricated.

At his July 2002 deposition, Badgley testified he knew Glassen, but could not recall that he had been investigated for tampering with a witness. Badgley testified he did not recall knowing anything about this in 1995. *Id.* at 1118.

Badgley reviewed reports from officers as part of his regular staff meetings. Plaintiffs suggest the existence of coercive and abusive investigative techniques was manifest from the face of those reports so that Badgley knew or should have known Perez was deliberately fabricating evidence against the Doggetts. That is simply too great a stretch. *Id.* at 1101. Plaintiffs do not identify what they claim are the "obvious deficiencies" in Perez's police reports prepared in the Wenatchee Sex Ring investigations. Nor do plaintiffs identify the "obviously inappropriate investigative techniques employed by Perez" which were purportedly evident in his reports.

Plaintiffs say the Wenatchee Police Department had a custom of destroying its notes of interviews and Perez followed this custom. Plaintiffs, however, do not explain how this custom contributed to the alleged constitutional harm in plaintiffs' case. If Perez was truly bent on coercing false allegations of abuse from the Doggett children, would he really have wrote anything down in his personal field notes that was different from what he put in his final reports? [9] Plaintiff does not suggest what possible damning information Perez may have destroyed or concealed. Furthermore, the CPS workers who were present during the interviews did take notes which

---

9. In that regard, one has to ask how Badgley would have known from Perez's reports that Perez was either coercing allegations of abuse or concealing exculpatory evidence. In his statement of facts, plaintiff says at one point that "Perez does not disclose in his police report that he yelled at Amber [Doggett]." If Perez yelled at Amber, he certainly would not

admit that in a police report. In his statement of facts, plaintiff says "Perez never created a police report regarding the physical violence he was using against Donna Everett while she lived with him." Again, it is difficult to fathom that Perez would ever admit to such a thing in a police report authored by him. *Gausvik,* 239 F.Supp.2d at 1104 n. 37.

can be compared to what Perez wrote in his final reports. Plaintiff cites those very notes in contending that Perez coerced allegations of abuse from children. *Id.* at 1103–04.

Plaintiffs have not offered evidence sufficient to raise a genuine issue of material fact that the City of Wenatchee had a "custom" of police officers deliberately fabricating evidence of sexual abuse by means of excessive coercion of children during interviews.

### b. Ratification

■ To show ratification, a plaintiff must prove that "authorized policymakers approve a subordinate's decision and the basis for it." *Christie v. Iopa,* 176 F.3d 1231, 1239 (9th Cir.1999), quoting *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Ratification, requires, among other things, knowledge of the alleged constitutional violation. *Id.* at 1239. Ratification must be evidenced by an official's "conscious, affirmative choice." *Gillette,* 979 F.2d at 1347.

■ The evidence offered by plaintiffs in support of their argument that Badgley "ratified" alleged constitutional violations by Perez is the same as the evidence offered in support of their "custom" argument. As should be apparent from the foregoing discussion regarding "custom," there is insufficient evidence to create a genuine issue of material fact that Badgley had actual knowledge of constitutional violations by Perez, let alone approved of the same.

### c. Training

■ A municipality can be held liable under § 1983 for failure to train, supervise or discipline its employees. However, "the inadequacy of training policy may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come in contact." *City of Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Deliberate indifference may be established by demonstrating a failure to train officials in a specific area where there is an obvious need for training in order to avoid violations of citizens' constitutional rights. Secondly, a municipality may be held responsible where a pattern of unconstitutional conduct is so pervasive as to imply actual or constructive knowledge of the conduct by the policymakers, whose deliberate indifference to the unconstitutional practice is evidenced by failure to correct the situation when the need for the training becomes obvious. *Id.* at 396–97, 109 S.Ct. 1197.

■ The deliberate indifference standard pertains to what is necessary to establish that municipal policy is the "moving force" behind a constitutional violation. *Id.* at 388, n. 8, 109 S.Ct. 1197. A plaintiff must identify a particular deficiency in the training program and prove the deficiency was the cause of the constitutional injury. It is not enough to establish that a particular officer was inadequately trained, or that there was a negligent administration of an otherwise adequate program, or that the conduct resulting in the injury could have been avoided by more or better training. *Id.* at 390–91, 109 S.Ct. 1197.

■ Plaintiffs contend Perez's basic law enforcement academy training contained no specialized programs on investigation of child sex abuse cases and there is no evidence the additional 40 hours of training Perez received in December of 1993 "offered instruction sufficient to sensitize officers like Perez to the difficulties inherent in leading a widespread investigation into child abuse." Plaintiffs also allege the training received by Perez should have supplied him with adequate information to recognize the local pediatric sexual

abuse examiners were inadequately trained.

These are conclusory, general allegations of deficiencies in the training received by Perez, not to mention the fact that whether a pediatrician is adequately trained in sexual abuse is something outside the expertise of a law enforcement officer. Furthermore, plaintiffs cite to no evidence in support of their allegations. Plaintiffs assert the "need for more or different training" was obvious. That, however, is the same as saying Perez's alleged unconstitutional conduct could have been avoided by "more or better training," which as discussed above, is plainly inadequate under *Canton*.

### d. Hiring

 In their response memorandum, plaintiffs tender no argument regarding alleged improper hiring of Perez by the City of Wenatchee. Yet in their Statement Of Material Facts (Paragraphs 18–25 at pp. 6–8, Ct. Rec. 82), they offer evidence which apparently is intended to establish the city was "deliberately indifferent" in its hiring of Perez and this eventually led to the constitutional violations alleged by plaintiffs. The failure to make this argument in the response memorandum is reason enough to ignore the evidence, but the court will address it nonetheless.

Plaintiffs note that on his "Application For Employment" with the City of Wenatchee, Perez indicated he graduated from Wenatchee High School (Ex. 1 to Declaration of John S. Stocks In Opposition To Defendants' Motion For Summary Judgment, Ct. Rec. 79). On what apparently is an accompanying "Personal History State-

ment," however, he indicated he passed the GED test (General Educational Development) (*Id.* at p. 000032) and this is corroborated by a report from Wenatchee Valley College (*Id.* at p. 000022). It is not clear to this court from what is contained in Ex. 1 that Perez was deliberately trying to mislead the city about his educational background. Indeed, in a background investigation report dated November 14, 1983 and sent to Badgley, Captain Charles H. Thompson indicated plaintiff attended Wenatchee High for "a short period of time" and then "went to Wenatchee Valley College and obtained a very high score." (*Id.* at p. 000018). Thompson did not say Perez had graduated from high school and the reference to a "very high score" must be to the GED score Perez received on the test he took at Wenatchee Valley College.

On his "Personal History Statement," Perez listed one arrest and/or criminal conviction, that from 1972 apparently involving a petty theft charge which was subsequently expunged from his record. (*Id.* at p. 000040). On his polygraph examination administered by the Wenatchee Police Department on November 22, 1983 (*Id.* at pp. 000002–000016), the results thereof which were submitted to Badgley on November 28, 1983 (*Id.* at p. 000001), Perez acknowledged: 1) that his driver's license had previously been suspended in 1971 for reckless driving[10]; 2) that he was charged with amphetamine possession, but the charges were dismissed[11]; and 3) that he was apparently convicted for passing insufficient checks, but he made reimbursement and the conviction was expunged.[12] It appears the passing of insufficient checks resulted in the 1972 petty theft conviction referred to by Perez in his

---

10. This would not have been listed on the "Personal History Statement" since it appears to have been a traffic citation.

11. This was not listed on the "Personal History Statement," but it is unclear whether Perez

was in fact arrested and there is no indication he was convicted.

12. The polygraph examiner determined that Perez had been truthful during his examination. (Ex. 1 at p. 000001).

"Personal History Statement." In his report to Badgley, Captain Thompson indicated with regard to "Legal:"

A check with Washington State Identification Bureau shows no record. No record in Texas or Arizona. Local record shows one petit larceny by check, 9–15–72. Mr. Perez was 18, at the time, and advised his payroll check was no good, so his personal checks were returned. He was out of town, working for three weeks and there was a warrant when he returned. He made the checks good. (*Id.* at p. 000019).

Plaintiffs claim that it was not until three years later in 1975 that Perez was arrested on the 1972 petty theft charge. According to plaintiffs, Perez claimed he was out of town when some of the checks failed to clear and that he paid them some three months later, but this must be a lie because he was not arrested until 1975 on the warrant. It is impossible to determine from plaintiffs' Ex. 3 (Ex. 3 to Declaration of John S. Stocks at Ct. Rec. 79) if Perez was in fact arrested in 1975. Ex. 3 is not a certified official record of a court, but a newspaper article, the date thereof which is not apparent. Moreover, although Perez claimed to have eventually made payment on the checks, there is nothing in Exs. 1, 2 or 3 to the Declaration of John S. Stocks indicating Perez specifically represented to anyone that he made payment within three months of returning to town. All he apparently told Captain Thompson was that he was out of town for three weeks and there was a warrant when he returned, not that he was necessarily arrested immediately upon his return and promptly made good on the checks.

Plaintiffs assert that "[b]efore his preemployment polygraph examination, two questions regarding prior convictions were crossed off the list of questions to be asked of Perez." (Ex. 1 at p. 000003). Actually, it appears there was one question crossed off regarding prior convictions and one question crossed off regarding prior firings from employment. Plaintiff, however, was also asked questions about prior arrests, drug usage, selling of drugs, involvement in serious crime, and theft.[13] And in any event, on the actual polygraph examination itself, plaintiff was asked whether he had ever been convicted of a misdemeanor or a felony and he responded "yes." (*Id.* at p. 000009).

In sum, plaintiffs' evidence does not establish that Perez was less than forthright with the Wenatchee Police Department about his previous encounters with the law. Furthermore, a reckless driving conviction, a petty theft conviction later expunged, and a charge of possession of amphetamine would not have made it "plainly obvious" to Badgley and the City of Wenatchee that 25 years later Perez might deliberately fabricate evidence against criminal defendants. *Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

There is no dispute that in August 1984, the Washington State Employment Security Department determined Perez had failed to inform the department he had attended the Basic Law Enforcement Academy from March 7, 1983 through May 20, 1983 making him ineligible for $1200 in benefits during that period of time because he was "not available for work or actively seeking work." The department found Perez had "knowingly failed to report material facts and thereby obtained ... benefits." (Ex. 4 to Declaration of John S. Stocks at Ct. Rec. 79).

This is insufficient to create a genuine issue of material fact that Wenatchee's

---

**13.** It appears to the court that this form was completed after the examination, not before, as evidenced by Question No. 21: "When you answered the interview questions, did you tell me even one lie?"

decision to hire Perez reflected a conscious disregard for a high risk that Perez would deliberately fabricate evidence in violation of plaintiffs' constitutional rights. As defendants observe, the *Bryan* test is a very stringent one:

> Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the **plainly obvious** consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'

117 S.Ct. at 1392 (emphasis added). The reason for the stringency is that:

> Where a claim of municipal liability rests on a single decision, not itself representing a violation of federal law and not directing such a violation, the danger that a municipality will be held liable without fault is high. Because the decision necessarily governs a single case, there can be no notice to the municipal decisionmaker, based on previous violations of federally protected rights, that his approach is inadequate. Nor will it be readily apparent that the municipality's action caused the injury in question, because the plaintiff can point to no other incident tending to make it more likely that the plaintiff's own injury flows from the municipality's action, rather than from some other intervening cause.

*Id.* at 1390. In the end, the Supreme Court did not even formally decide that proof of a single instance of inadequate screening could trigger municipal liability. *Id.* at 1392.[14] In *Bryan,* the Supreme Court "assumed" it could trigger such liability, but found under the circumstances of that case that the evidence was insufficient to support a finding that in hiring a certain deputy, the Sheriff of Bryan County had disregarded a known or obvious risk of injury to the plaintiff. *Id.*[15]

In the case at bar, it initially bears pointing out that Perez apparently was hired in January of 1984 (Ex. 6 to Declaration of John S. Stocks at Ct. Rec. 79)[16] and therefore, had already been with the police department for seven months before the Employment Security Department issued its ruling. In other words, it appears Perez had already been hired before the matter came up. And in any event, a jury simply could not conclude that because of this matter, it was "plainly obvious" to Badgley that ten years later Perez would allegedly coerce children into making false allegations of sexual abuse against adults.[17]

---

**14.** In *Bryan,* the plaintiff did not contend the Sheriff's hiring practices were "generally" defective. 117 S.Ct. at 1390. The same is true here.

**15.** In *Bryan,* Reserve Deputy Burns was alleged to have used excessive force upon the plaintiff (Brown) during an arrest in May 1991 causing severe injury to plaintiff's knees. When Burns was a college student, he was involved in a fight on campus which resulted in him being charged with assault and battery, resisting arrest, and public drunkenness. He pleaded guilty to those charges in January 1990, as well as to various driving-related offenses. The Supreme Court acknowledged the fact Burns had pleaded guilty to traffic offenses and other misdemeanors "may well have made him an extremely poor candidate for reserve deputy." 117 S.Ct. at 1393. It did not, however, make it "plainly obvious" to the Sheriff that Burns would use excessive force upon the plaintiff.

**16.** A seniority date of Jan. 4, 1984 is indicated on Ex. 6.

**17.** Perez's 1989 annual performance evaluation criticized him for, among other things, being "like a wound up wire, ready to spring." His 1990 evaluation, however, stated Perez had shown "significant improvement in the past year in several performance categories" including becoming "more people oriented and his patience with those he contacts

## B. Supervisory Liability Badgley

 Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates. *Clay v. Conlee,* 815 F.2d 1164, 1170 (8th Cir. 1987). A supervisor cannot be held liable under § 1983 on a respondeat superior basis. *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989). An official who has failed to prevent a constitutional violation by inadequately training, supervising or investigating his subordinates may be liable under § 1983 if the plaintiff shows: 1) the supervisor possessed the requisite culpable state of mind; and 2) a causal connection between the supervisor's action or inaction and the infliction of the alleged constitutional harm. *Redman v. County of San Diego,* 942 F.2d 1435, 1446–47 (9th Cir. 1991) (en banc), cert. denied 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992). Culpability is established by showing the supervisor was deliberately indifferent to "acts by others which the [supervisor] knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* at 1447. When applied to determine the culpability of a supervisor who "failed to act to prevent" a constitutional injury, the deliberate indifference standard is objective in nature. *Id*

As discussed above, plaintiffs fail in their attempt to establish liability by the City of Wenatchee through action or inaction by Chief Badgley as an official policymaker for the city. That failure dictates failure in their attempt to establish Badgley's liability in his individual capacity There is no evidentiary support for plaintiff's allegations that Badgley somehow personally participated in the alleged constitutional harm which Perez perpetrated upon the plaintiffs. There is no evidentiary support for plaintiff's allegations that something Badgley did or did not do caused the alleged constitutional harm suffered by plaintiffs. There is no evidence that Badgley was deliberately indifferent to alleged unconstitutional conduct by Perez perpetrated upon the plaintiffs.

## C. Conspiracy

 A conspiracy in violation of § 1983 [18] requires proof of: (1) an agreement between the defendants to deprive the plaintiff of a constitutional right; (2) an overt act in furtherance of the conspiracy and; (3) a constitutional violation. *Gilbrook v. City of Westminster,* 177 F.3d 839, 856–57 (9th Cir.1999) (en banc).

All that plaintiffs offer regarding their conspiracy claims are the allegations found in their complaint. (See pp. 2–4 of plaintiff's Response Memorandum at Ct. Rec. 78). Plaintiffs cannot rely on the allegations in their complaint to withstand summary judgment. *Anderson v. Liberty Lob-*

---

has improved." The 1989 evaluation, particularly in light of the 1990 evaluation, would not have served as notice to Badgley that Perez presented a problem and should have never been assigned to investigate child abuse cases several years later. Dr. Goodwin spoke of a 1991 evaluation which criticized Perez as a "live wire ready to go off," but it appears the evaluation to which he was actually referring was the one from 1989. *Gausvik,* 239 F.Supp.2d at 1112 n. 2.

In 1997, Perez was diagnosed with Post–Traumatic Stress Disorder by a Dr. James Goodwin. Dr. Goodwin suggested the disorder started as early as 1994 which would have been prior to the Doggett investigation in 1995. Nevertheless, there is no evidence that Badgley would have been aware of this mental condition in 1995. *Id.* at 1101 n. 30

**18.** See 42 U.S.C. § 1985(3).

*by, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505. They have offered no evidence to create a genuine issue of material fact that there was a conspiracy to violate their constitutional rights. Moreover, because there is no basis for liability of the City of Wenatchee or for supervisory liability of Badgley, that leaves Perez as the sole defendant in this action and makes a conspiracy impossible.[19]

## IV. CONCLUSION

Defendants' Motion For Summary Judgment (Ct.Rec.20) is **GRANTED**. Defendants City of Wenatchee and Badgley are awarded summary judgment on all of plaintiffs' 42 U.S.C. § 1983 claims. Defendant Perez is also awarded summary judgment on plaintiffs' § 1983 conspiracy claim asserted against him.

**IT IS SO ORDERED**. The District Executive is directed to enter this order and forward copies to counsel.

---

19. Defendants Fore and Chelan County were previously dismissed from the action pursuant to stipulation of the parties. (Ct.Rec.25).